1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9

10  The Navajo Nation, et al.                )
                                             )
11                       Plaintiffs,         )      No. CV 05-1824-PCT-PGR
                                             )          CV 05-1914-PCT-EHC
12                                           )          CV 05-1949-PCT-NVW
                                             )          CV 05-1966-PCT-JAT
13                                           )          (consolidated)
                                             )
14         vs.                               )      **ORDER**
                                             )
15  U.S. Forest Service, et al.              )
                                             )
16                       Defendants.         )
                                             )
17  _____)

18         This consolidated matter comes before the Court on the parties' cross-motions for

19  summary judgment and following a bench trial on Plaintiffs' claims brought under the

20  Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb-2000bb-4 ("RFRA").[1]  The Court

21  now makes its ruling.

22

23  _____

24         [1]The Complaint for the Navajo Nation and the Sierra Club was initially filed on June 17,
    2005.  However, on June 23, 2005, before the Complaint was served, the Navajo Nation and Sierra
25  Club filed a First Amended Complaint that added as Plaintiffs the White Mountain Apache Tribe,
    the Yavapai-Apache Tribe, the Center for Biological Diversity and the Flagstaff Activist Network.
26  These parties will be referred to as the Navajo Plaintiffs throughout this opinion.  Shortly after the
    Navajo Plaintiffs amended their Complaint, three separate Complaints were filed by: (1) Hualapai
27  Tribe, Norris Nez, and Bill Bucky Preston ("Hualapai Plaintiffs"); (2) Rex Tilousi, Dianna Uqualla,
    and the Havasupai Tribe ("Havasupai Plaintiffs"); and (3) the Hopi Tribe.  On unopposed motion,
28  these matters were transferred and consolidated with the instant action on July 13, 2005.

## I.     Factual Background

This case involves a challenge to the Forest Service's decision to authorize upgrades to facilities at the Arizona Snowbowl ("Snowbowl"), an existing ski area in the Coconino National Forest ("CNF").[2] The Plaintiffs in this consolidated case include the Navajo Nation, the Hopi Tribe, the Havasupai Tribe, the Hualapai Tribe, the Yavapai Apache Nation, the White Mountain Apache Nation, Bill Bucky Preston (a member of the Hopi Tribe), Norris Nez (a member of the Navajo Nation), Rex Tilousi (a member of the Havasupai Tribe), Dianna Uqualla (a member of the Havasupai Tribe), the Sierra Club, the Center for Biological Diversity, and the Flagstaff Activist Network.  The Defendants are the United States Forest Service ("Forest Service"), Nora Rasure, the Forest Supervisor, and Harv Forsgren, who was the appeal deciding officer and Regional Forester.  Both Ms. Rasure and Mr. Forsgren were named as Defendants in their individual capacity.  In addition, the Arizona Snowbowl Resort Limited Partnership ("ASR"), the current owner and operator of the facilities located at the Snowbowl ski area, moved to intervene in these proceedings on June 27, 2005.  After receiving briefing on ASR's motion and hearing oral argument, the Court granted ASR's Motion to Intervene (Doc. 45) on July 18, 2005.

The Snowbowl lies on the western flank of the San Francisco Peaks ("Peaks"), and is operated under a 777-acre Forest Service-issued SUP, which is renewable on a 40-year basis.  The CNF Land and Resource Management Plan ("Forest Service Plan"), which was subject to its own process under the National Environmental Policy Act ("NEPA") and adopted in 1987, designates the entirety of the Snowbowl SUP as a "Developed Recreation Site."  Under the Forest Service Plan, the Snowbowl is located within management area ("MA") 15, which has a management emphasis of developed recreation, including the

---

[2]The current proposal does not seek to expand the existing Snowbowl Special Use Permit ("SUP") of 777-acres, but instead, seeks to upgrade the Snowbowl's existing facilities and infrastructure.  Many of the activities approved by the current Snowbowl decision were previously authorized by the 1979 Environmental Impact Statement ("EIS"), and all of the approved activities are within the preexisting permit boundary.

Snowbowl recreation facilities. Furthermore, the Snowbowl is surrounded on three sides by the 18,963-acre Kachina Peaks Wilderness, which is designated as MA 1 and managed for wilderness values.

The Snowbowl has been used as a ski area since 1938. In 1979, the Forest Service conducted an extensive process pursuant to NEPA to evaluate proposed upgrades to the Snowbowl, which included the installation of new lifts, trails and facilities. Specifically, the 1979 Snowbowl decision approved 206 acres of skiable terrain and facilities to support a comfortable carrying capacity ("CCC") – the number of guests that the Snowbowl facilities could comfortably carry at one time – of 2,825 skiers. The Forest Service's decision to approve the proposed action was challenged in court by several Indian tribes. The tribes asserted that development of the Peaks would be a profane act, and an affront to the deities, and that, in consequence, the Peaks would lose their healing power and otherwise cease to benefit the tribes. Wilson v. Block, 708 F.2d 735, 738 (D.C. Cir. 1983), cert. denied, 464 U.S. 956 (1983). In addition, the tribes argued that development would seriously impair their ability to pray and conduct ceremonies upon the Peaks. Id. However, the District of Columbia Court of Appeals eventually upheld the Forest Service's decision to move forward with the upgrades. Id. at 760.

Since 1979, the Snowbowl has operated under the direction of the EIS upheld in Wilson. Many of the improvements authorized by the Forest Service in 1979, and later upheld by the Wilson decision, have been implemented over the years. However, in September of 2002, ASR sought to implement the remaining previously authorized upgrades (including cutting certain ski runs), and submitted a formal proposal to implement snowmaking at the facility using A+ reclaimed water. After an extensive environmental review under NEPA that spanned several years of public participation, tribal consultation and input, and analysis, the Forest Service ultimately approved ASR's proposal. Specifically, in February of 2005, Forest Supervisor Nora Rasure issued a Final Environmental Impact Statement ("FEIS") and a Record of Decision ("ROD"). The Forest Service's ROD approved,

in part: (a) approximately 205 acres of snowmaking coverage throughout the area, utilizing reclaimed water; (b) a 10 million-gallon reclaimed water reservoir near the top terminal of the existing chairlift and catchments pond below Hart Prairie Lodge; (c) construction of a reclaimed water pipeline between Flagstaff and the Snowbowl with booster stations and pump houses; (d) construction of a 3,000 to 4,000 square foot snowmaking control building; (e) construction of a new 10,000 square foot guest services facility; (f) an increase in skiable acreage from 139 to 205 acres – an approximate 47% increase;[3] and (g) approximately 47 acres of thinning and 87 acres of grading/stumping and smoothing. The Plaintiffs appealed the Forest Supervisor's decision, and the Forest Service's Southwestern Regional Office arranged a technical review team to evaluate the administrative appeals. On June 8, 2005, the Forest Service issued its final administrative decision and affirmed the Forest Supervisor's original conclusions. This litigation followed.[4]

On August 12, 2005, the parties filed cross-motions for summary judgment on, in part, claims brought pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"). The APA claims are based on the Forest Service's alleged failure to comply with requirements of NEPA, 42 U.S.C. §§ 4321-4307d ("NEPA"), the National Historic Preservation Act, 16 U.S.C. §§ 470 et seq. ("NHPA"), RFRA, 42 U.S.C. §§ 2000bb-2000bb-4 ("RFRA"), the Endangered Species Act, 16 U.S.C. § 1531 et seq. ("ESA"), the Grand

---

[3] It is important to note that although only 139 acres of skiable terrain currently exist at the Snowbowl, the Wilson decision specifically approved 206 acres of skiable terrain. Accordingly, the current proposal, to the extent it seeks to increase skiable acreage, is fully consistent with the D.C. Circuit's previous ruling in 1983 upholding the Forest Service's 1979 decision.

[4] Shortly after filing their complaints, the Plaintiffs filed a Motion for Temporary Restraining Order Or, In the Alternative, Preliminary Injunction (Doc. 5). A few days later, the Plaintiffs filed a Stipulated Motion to Withdraw Plaintiffs' Motion for Temporary Restraining Order (Doc. 12), and requested that the Court set a briefing schedule for Plaintiffs' preliminary injunction motion. The stipulated motion was granted by the Court. On July 13, 2005, the Court heard oral argument on the Plaintiffs' Motion for Preliminary Injunction. However, the request for relief was denied as moot after the parties agreed that ASR would not move forward with the project until after the Court ruled on the anticipated summary judgment motions and, if necessary, held a bench trial on the RFRA claims.

Canyon National Park Enlargement Act, 16 U.S.C. § 228i ("GCEA"), and the National Forest Management Act, 16 U.S.C. §§ 1600-1687 ("NFMA"). In addition, an alleged failure of the Forest Service to comply with its trust responsibility to the tribes was included in these motions.

## II.     Legal Standard and Analysis

In reviewing administrative agency decisions, the function of the district court is to determine, as a matter of law, whether evidence in the administrative record permitted the agency to render the decision it did. Accordingly, summary judgment is an appropriate mechanism for deciding the legal question of whether an agency could reasonably have found the facts as it did.

A person suffering legal wrong because of an agency action, or adversely affected or aggrieved by an agency action within the meaning of the relevant statute, is entitled to judicial review thereof. 5 U.S.C. § 702. Agency action made reviewable by statute, and final agency action for which there is no other adequate remedy in a court, are subject to judicial review. 5 U.S.C. § 704. Under the APA, a reviewing court may "hold unlawful and set aside agency action, findings and conclusions" that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706; <u>Center for Biological Diversity v. United States Forest Service</u>, 349 F.3d 1157, 1165 (9th Cir. 2003). To determine whether agency action was arbitrary or capricious, a court must consider "whether the decision was based upon a consideration of the relevant factors and whether there has been a clear error of judgment." <u>Marsh v. Oregon Natural Resources Council</u>, 490 U.S. 360, 368 (1989).

### A.     National Environmental Policy Act

The purpose of NEPA, 42 U.S.C. §§ 4321 <u>et</u> <u>seq.</u>, is to focus the attention of federal agencies and the public on a proposed action so that the environmental impacts of the action can be studied before a decision is made. By focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will

- 5 -

not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast.  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, (1989).  Accordingly, NEPA requires federal agencies to prepare an EIS for all "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2).  However, NEPA does not mandate certain substantive results, but instead prescribes the necessary process an agency must undergo to evaluate a proposed action's potential environmental impact.  Methow Valley, 490 U.S. at 350.

In reviewing the required EIS, the court must determine whether the document contained a "reasonably thorough discussion of the significant aspects of the probable environmental consequences."  Idaho Conservation League v. Mumma, 956 F.2d 1508, 1519 (9th Cir. 1992).  Within the Ninth Circuit Court of Appeals, courts are directed to employ a "rule of reason" standard to make this finding.  Center for Biological Diversity, 349 F.3d at 1166.  Under the rule of reason standard, which is essentially applied in the same manner as the arbitrary and capricious standard, review consists only of ensuring that the agency has taken a hard look at the environmental effects of the proposed action.[5]  Id.  Once the court is satisfied that a proposing agency has taken the requisite hard look at a decision's environmental consequences, the review is at an end.  Friends of the Southeast's Future v. Morrison, 153 F.3d 1059, 1063 (9th Cir. 1998).

It is the Plaintiffs' position that the Forest Service failed to take the required hard look at the environmental consequences of its actions, and that as a result, the Forest Service's actions were arbitrary, capricious and not otherwise in accordance with law.  However, the Defendants and Intervenor respond that the Forest Service fully discharged its NEPA responsibilities by preparing an EIS with public involvement.  Each NEPA violation alleged by the Plaintiffs is discussed individually below.

---

[5] The Court notes that the adjective "hard," and the phrase "hard look," are subject to at least twenty-five different definitions or meanings. Nevertheless, the parties have used the phrase "hard look" to define the nature of the inquiry required of the Forest Service; therefore, it is reluctantly adopted by the Court.

### 1.    Statement of Purpose and Need

The Plaintiffs in this case allege that the stated purpose and need for the proposed action is impermissibly narrow, improperly focused solely on improving the Snowbowl's financial viability, and based on faulty data. The Defendants and Intervenor assert that the stated purpose and need is reasonable and provided the basis for the Forest Service's consideration of a reasonable range of alternatives. The Forest Service identified the overall purpose and need for the project as follows: (1) to ensure a consistent and reliable operating season, thereby maintaining the economic viability of the Snowbowl and stabilizing employment levels and winter tourism within the local community; and (2) to improve safety, skiing conditions, and recreational opportunities, bringing terrain and infrastructure into balance with current use levels.

The regulations implementing NEPA explain that an EIS "shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13.  Furthermore, the Ninth Circuit has determined that agencies should be afforded considerable discretion in defining the purpose and need of a project. Morrison, 153 F.3d at 1066.  However, this discretion is not without limitations. Id. For example, "an agency cannot define its objectives in unreasonably narrow terms." City of Carmel by the Sea v. United States Dep't. of Transp., 123 F.3d 1142, 1155 (9th Cir. 1997); see also City of New York v. United States Dep't of Transp., 715 F.2d 732, 743 (2d Cir. 1983) ("[A]n agency will not be permitted to narrow the objective of its action artificially and thereby circumvent the requirement that relevant alternatives be considered.").

The Court concludes that the Forest Service's statement of purpose and need for the proposed project is not unreasonable.  See City of Carmel by the Sea, 123 F.3d at 1155 (Forest Service's statement of purposes is to be evaluated under a reasonableness standard). The Forest Service Plan, which the Forest Service points out was subject to its own NEPA process, designates the entirety of the Snowbowl SUP as a "Developed Recreation Site." Under the Forest Service Plan, the Snowbowl is located within MA 15, which has a

management emphasis of developed recreation, including the Snowbowl recreation facilities. Furthermore, the Final EIS explains that the proposed action "responds to the goals and objectives outlined in the Forest Service Plan, and helps move the project area towards desired conditions described in it." For example, the FEIS states that one purpose of the proposed action is to "ensure a consistent and reliable operating season" at the Snowbowl. According to the Forest Service, because skier visits at the Snowbowl are directly correlated to the amount of snow on the ground, the significant variability in snowfall has resulted in an inconsistent operating season. In addition, the goal of providing a reliable ski season is consistent with the Forest Service's multiple-use mandate and direction to provide recreational opportunities for the public.

The Court notes that the FEIS also identifies the need "to improve safety, skiing conditions, and recreational opportunities by bringing existing terrain and infrastructure into balance with existing demand." For example, the Forest Service identified a need to "[i]mprove the quantity and distribution of beginner and intermediate (including low intermediate and advanced intermediate) terrain and skier safety by developing additional terrain within the existing SUP area." The FEIS adequately documents that the Snowbowl has a deficit of intermediate and beginner terrain when compared to ski industry norms. In sum, the Court concludes that the Forest Service developed a reasonable statement of purposes and needs under the standard developed by the Ninth Circuit.

## 2.    Reasonable Range of Alternatives

Next, the Plaintiffs contend that the Forest Service violated NEPA by failing to consider a reasonable range of alternatives. For example, the Navajo Plaintiffs contend that the Forest Service should have considered a proposal to close the ski area, a buy-out by the tribes, or an alternative with reduced snowmaking coverage. In addition, the Havasupai Plaintiffs maintain that the Forest Service should have considered water trading. In response, the Forest Service states that it did, in fact, consider many of the alternatives raised by the Plaintiffs, but reasonably eliminated them from more detailed evaluation because they did

1    not meet the purposes and needs for the proposed action.  Moreover, the agency points out

2    that many of the alternatives proposed by the Plaintiffs do not represent feasible propositions.

3        The Code of Federal Regulations requires that only reasonable alternatives be

4    considered.  40 C.F.R. § 1502.14.

5            In this section agencies shall:

6            (a) Rigorously explore and objectively evaluate all reasonable
        alternatives, and for alternatives which were eliminated from

7            detailed study, briefly discuss the reasons for their having been
        eliminated.  (b) Devote substantial treatment to each alternative

8            considered in detail including the proposed action so that
        reviewers may evaluate their comparative merits.  (c) Include

9            reasonable alternatives not within the jurisdiction of the lead
        agency.  (d) Include the alternative of no action.  (e) Include

10           appropriate mitigation measures not already included in the
        proposed action or alternatives.

11   40 C.F.R. § 1502.14.

12

13       "An agency's discussion of alternatives must be bound by some notion of feasibility."

14   Muckleshoot v. United States Forest Service, 177 F.3d 800, 814 (9th Cir. 1999).  In addition,

15   an agency need not consider every available alternative.  Headwaters, Inc. v. Bureau of Land

16   Management, 914 F.2d 1174, 1180 (9th Cir. 1994).  The range of alternatives is reviewed

17   under a rule of reason that requires an agency to set forth only those alternatives necessary

18   to permit a reasoned choice.  Id.  NEPA does not require a separate analysis of alternatives

19   which are not significantly distinguishable from alternatives actually considered, or which

20   have substantially similar consequences.  Id. at 1181.  However, NEPA does require federal

21   agencies to rigorously explore and objectively evaluate all reasonable alternatives.  With

22   respect to alternatives that were eliminated from detailed study, NEPA simply requires a

23   brief discussion of the reasons for their elimination.  40 C.F.R. § 1502.14(a).  As the parties

24   correctly identify, "[t]he existence of reasonable but unexamined alternatives renders an EIS

25   inadequate."  Morrison, 153 F.3d at 1065; see also Muckleshoot, 177 F.3d at 814.

26       A review of the EIS shows that the Forest Service gave detailed consideration to three

27   alternatives: (1) the no action alternative; (2) the proposed action; and (3) the no snowmaking

28                             - 9 -

or snowplay alternative, which responds to public concerns over the use of reclaimed water on the Peaks. Furthermore, the Forest Service also gave consideration to an alternative to remove the ski area; several alternatives that would have included night lighting; an alternative with a lower amount of new skiable terrain; an alternative with reduced snowmaking coverage; alternatives that would have included summer recreational activities such as mountain biking; alternatives that would have used on-site or nearby water sources instead of reclaimed water; and an alternative that would have used other pipeline alignments. In addition, the Court concludes that the Forest Service properly eliminated closure of the Snowbowl from detailed analysis because it did not meet the stated purposes and needs for the proposed action. Since the Coconino Forest Service Plan instructs that the 777 acres of the Snowbowl be managed to emphasize developed recreations, an alternative that would dismantle the ski area was certainly outside the scope of the proposed action and need not have been considered in detail. As the Ninth Circuit has previously stated, "[w]hen the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved." City of Angoon v. Hodel, 803 F.2d 1016, 1021 (9th Cir. 1986).

The statement of purposes and needs for the Snowbowl proposal permitted the Forest Service to evaluate a reasonable range of alternatives. The Plaintiffs bear the burden of demonstrating to the Court that they brought a reasonable alternative to the Forest Service's attention during the public NEPA process, and that such an alternative was not adequately considered. City of Angoon, 803 F.2d at 1021-22. The Plaintiffs have failed to meet this burden.[6] Accordingly, the Court concludes that the Forest Service did not act unreasonably

---

[6]Many of the reasonable alternatives Plaintiffs now advance in their respective motions for summary judgment were never raised in the NEPA comment process or in the administrative appeals. Accordingly, this failure now bars them from judicial review due to the requirement of exhaustion. For example, although they now claim otherwise, not one tribal plaintiff comment letter or appeal letter mentions the buy-out alternative now advanced by the Navajo Plaintiffs. However, the Court notes that even if the alternative was properly raised before the Forest Service, it is not significantly distinguishable from an alternative to close the ski area, which was considered. See

in rejecting the various alternatives raised by the Plaintiffs during the project's public scoping process.

### 3.    Cumulative and Indirect Impacts

#### a.    Impacts of Diverting 1.5 Million Gallons of Reclaimed Water a Day

The Plaintiffs contend that the Forest Service failed to take the requisite hard look at the environmental impacts of the Snowbowl expansion project by neglecting to consider the cumulative impacts and/or indirect effects of diverting 1.5 million gallons of reclaimed water a day from Flagstaff's aquifer to the Snowbowl for snowmaking.[7] The Plaintiffs assert that "the proposed snowmaking will result in a decrease to the aquifer" and point to a technical report prepared by Peter Schwartzman and Abe Springer, along with other public comments as the basis for their argument. However, the Court concludes that the Forest Service did not refuse or fail to consider this impact.

A review of the FEIS reveals that the Forest Service identified the proposed action's potential impacts on aquifer recharge as an area requiring additional analysis and disclosure. The Snowbowl FEIS Section on Watershed Resources – Chapter 3H – specifically analyzed the potential long-term effects on the regional aquifer from diversions of reclaimed water for snowmaking. For example, the agency contracted hydrologists to study "precipitation; water

_____

Headwaters, 914 F.2d at 1180-81.

[7]The Plaintiffs also maintain that the Forest Service failed to address the cumulative and indirect impacts on noise, on aesthetics, on traffic and ski area access, and on wildlife and habitat. However, a review of the FEIS reveals that the Forest Service specifically evaluated and disclosed the anticipated effects of each of these categories. For example, regarding noise impacts, the Forest Service determined that from a distance of 1.5 miles and closer, the snowmaking system would be audible and above ambient noise levels. With respect to impacts on aesthetics, the Forest Service used the Visual Management System – a landscape management tool – to evaluate the proposed action's impacts to certain visual quality objectives and disclosed the cumulative visual effects in the FEIS. In addition, the FEIS documents careful consideration of impacts to traffic and ski area access in Section 3C. Lastly, Section 3K of the FEIS contains a detailed analysis of the Snowbowl proposal's potential impacts on wildlife.

loss to evaporation, transpiration, and sublimation; and the resulting water available for groundwater recharge or surface water run off." This data was then used to analyze how much water would be available for recharge to the regional aquifer. The Forest Service found that the proposed snowmaking would result in a reduction in groundwater recharge to the regional aquifer of slightly less than two percent of the City of Flagstaff's total annual water production. The cumulative watershed impact as a result of the diversion was determined to be negligible to moderate.[8] The Court also notes that in reaching this estimate, the Forest Service considered, among other sources, the Schwartzmann and Springer report raised by the Plaintiffs. In sum, the record demonstrates and the Court is satisfied that the Forest Service responded to concerns about the impacts to recharge of the aquifer by conducting reasonable analysis.

### b.   Impacts of Snowmaking Using Reclaimed Water

Next, the Plaintiffs contend that the Forest Service failed to conduct a reasonable scientific analysis of the environmental impacts of the proposed snowmaking. However, the Defendants and Intervenor maintain that the Forest Service took a hard look at the impacts of snowmaking using reclaimed water. The Court concludes that the record shows that the Forest Service conducted a reasonable scientific analysis of the environmental impacts of the proposed snowmaking based on the best available scientific evidence.

First and foremost, it is important for the Court to note that the Arizona Department of Environmental Quality ("ADEQ") has adopted water quality standards for the direct reuse of reclaimed water aimed at protecting health and the environment. Furthermore, the ADEQ specifically allows Class A+ reclaimed water–the class of water to be used at the Snowbowl–for direct reuse in snowmaking. As such, the Forest Service properly relied, in part, upon the ADEQ's determination that snowmaking is an acceptable and safe use of

_____

[8] Even with the amount of reclaimed water diverted to the Snowbowl, the Rio de Flag Water Reclamation Facility ("WRF") would still have over 500,000 gallons per day available for release to the Rio de Flag.

reclaimed water. In addition, the Forest Service evaluated extensive data monitoring Class A+ reclaimed water from the Rio de Flag WRF for wastewater constituent, as well as monitoring for metals, organic chemicals, and other parameters. Furthermore, the Forest Service also retained experts in hydrogeology to evaluate the effects of reclaimed water use on the quantity and quality of groundwater. In sum, the Court determines that the agency took a hard look at the effects of using Class A+ reclaimed water to make artificial snow at the Snowbowl.

### 4. Opposing Scientific Viewpoints

The Plaintiffs claim that the Forest Service failed to consider certain scientific evidence about the use of reclaimed water. Specifically, the Plaintiffs contend that the Forest Service failed to adequately discuss and disclose the results of the studies conducted by the United States Geological Survey ("U.S.G.S.") and Dr. Catherine Propper and the report submitted by Dr. Paul Torrence.[9] The Defendants and Intervenor maintain that the Forest Service adequately evaluated and responded to all reasonable opposing scientific viewpoints submitted during the NEPA process.

The Council on Environmental Quality's ("CEQ") regulations delineate the analysis that environmental impact statements must contain. Specifically, the agency "shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised." 40 C.F.R. § 1502.9(b); Center for Biological Diversity, 349 F.3d at 1167. This disclosure requirement obligates the agency to make available to the public high quality information, including accurate scientific analysis and expert agency comments, before

---

[9]Dr. Catherine Propper, Ph.D., is an Associate Professor in the Department of Biological Sciences at Northern Arizona University ("NAU"). Dr. Paul Torrence holds a Ph.D. in organic chemistry and is a Professor of Chemistry and Biochemistry at NAU. He is also a Full Investigator at the Arizona Cancer Center in Tucson. Both individuals submitted comments during the public scoping process concerning the potential health and environmental impacts of using reclaimed wastewater for snowmaking.

1   decisions are made and actions are taken. 40 C.F.R. § 1500.1(b). Furthermore, "an agency

2   is entitled to wide discretion in assessing the scientific evidence, so long as it takes a hard

3   look at the issues and responds to reasonable opposing viewpoints." Earth Island Institute

4   v. U.S. Forest Service, 351 F.3d 1291, 1301 (9th Cir. 2003). "Because analysis of scientific

5   data requires a high level of technical expertise, courts must defer to the informed discretion

6   of the responsible federal agencies." Id. "When specialists express conflicting views, an

7   agency must have discretion to rely on the reasonable opinions of its own experts, even if a

8   court may find contrary views more persuasive." Marsh, 490 U.S. at 377.

9          In this case, the record demonstrates that the agency evaluated and disclosed the

10  research by Dr. Propper. For example, the FEIS explains that Dr. Propper "conducted in

11  vitro (test tube) and in vivo (whole body) tests of Flagstaff wastewater effluent to evaluate

12  vertebrate behavior and physiological effects on the endocrine system." In addition, her

13  project proposal and the results of her research are included in the Administrative Record.

14  The Forest Service included within the FEIS the conclusion that the "proposed use of

15  reclaimed water for snowmaking at the Arizona Snowbowl will not result in comparable

16  environmental exposure as investigated by Dr. Propper." Based on the Forest Service's

17  analysis and disclosure of Dr. Propper's research, the Court cannot conclude that the agency

18  violated NEPA.

19         In addition, the Forest Service also responded to the concerns voiced by Dr. Torrence

20  within the FEIS. Dr. Torrence's comments made in response to the DEIS all focus on

21  variations of the same allegation: that the agency failed to fully consider the range of

22  implications of endocrine disruptors that may be present in reclaimed water. However, a

23  review of the FEIS reveals that the Forest Service considered the presence of synthetic

24  organic chemicals from pharmaceutical and personal care products in water and the potential

25  that some of the compounds will impact the endocrine system in wildlife and humans. The

26  Forest Service explained that "[r]ecent research indicates that endocrine disruptors have

27  aquatic habitat impacts, but no health impacts, at concentrations found in receiving waters."

28                                              - 14 -

The FEIS explains that the agency's analysis of this issue was based on its review of recent studies, as well as the Global Assessment on the State-of-the Science of Endocrine Disruptors, a report prepared by an expert panel on behalf of the World Health Organization.

The Court is satisfied that the Forest Service properly evaluated and disclosed all comments and reasonable opposing scientific viewpoints that were available during the NEPA process. Even if the Court were to find the viewpoints of Dr. Propper and Dr. Torrence more persuasive than the Forest Service's interpretation of the overall scientific evidence, that would not be enough to declare the agency's decision arbitrary and capricious. As indicated above, the Court is obligated to defer to the responsible federal agency's informed assessment of the scientific evidence.

### 5.    Failure to Make Decisional Materials Available

The Plaintiffs also argue that the Forest Service violated NEPA by failing to make decisional materials publicly available before its final decision was rendered. It is undisputed that the Forest Service was required to supplement the Snowbowl Project Record with certain documents that were part of the decision-making process. These documents – which included the Forest Service Plan and various letters sent to the tribes about the National Register nomination of the Peaks – were all referenced in record documents, even though they were not initially designated as part of the project record. Accordingly, any person seeking the information referenced or described in the project record would be aware of their existence. Under NEPA, an agency is required to "[m]ake environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act ["FOIA"]." 40 C.F.R. § 1506.6(f). The Court concludes that the Forest Service complied with this provision. As the Forest Service points out, all of the documents that were subject to release under FOIA were available upon request at any time during the NEPA process, and the Plaintiffs have offered no evidence to the contrary.

## B.     National Historic Preservation Act

The Plaintiffs argue that the Forest Service did not comply with its obligations under the NHPA. For example, the Plaintiffs contend that the tribes did not have a reasonable opportunity to participate in the resolution of the adverse effects of the proposed action. In addition, the Plaintiffs assert that the timing of the completion of the Memorandum of Agreement ("MOA"), before the end of the NEPA process, suggests that a NEPA decision had already been reached rendering the NHPA consultation inadequate.

The NHPA directs federal agencies to consider the effects of their undertakings on historic properties included in or eligible for inclusion in the National Register of Historic Places and to consult with certain parties before moving forward with an agency action. 16 U.S.C. § 407f; see 36 C.F.R. § 800.1. Regulations implementing the NHPA have been adopted by the Advisory Council on Historic Preservation ("ACHP"). The general procedure set forth in the applicable regulations requires an agency as early as possible, and in any event before taking any action that would foreclose the ACHP's ability to comment, to identify any National Register or eligible property located within the area of the undertaking's potential environmental impact which may be affected by the undertaking. 36 C.F.R. § 800.4. The agency must then determine the effect of a proposed undertaking on any National Register or eligible property.

An effect occurs (1) "whenever any condition of the undertaking causes or may cause any change, beneficial or adverse, in the quality of the historical, architectural, archeological or cultural characteristics that qualify the property for the National Register," or (2) when an undertaking "changes the integrity of location, design, setting, materials, workmanship, feeling, or association of the property" that contributes to its historic significance. 36 C.F.R. § 800.3(a) and (b); Colorado River Indian Tribes v. Marsh, 605 F. Supp. 1425, 1435 (D. Cal. 1985).

When an effect is identified, the agency, in consultation with the State Historic Preservation Office ("SHPO"), must determine whether the effect would be adverse. This

process includes applying the criteria of adverse effect, which includes: (1) destruction or alteration of all or part of a property; (2) isolation from or alteration of a property's surrounding environment; (3) introduction of visual, audible, atmospheric elements that are out of character with the property or alter its setting . . . . 36 C.F.R. § 800.3(b); Colorado River Indian Tribes, 605 F. Supp at 1435.

If the agency finds an adverse effect, then it must (1) prepare a Preliminary Case Report requesting the comments of the ACHP, (2) notify the SHPO of this request, and (3) undertake the consultation process set forth in § 800.6. Colorado River Indian Tribes, 605 F. Supp. at 1435. Under the consultation process set forth in § 800.6, the agency, the SHPO, and the Executive Director of the ACHP are the consulting parties who must "consider feasible and prudent alternatives to the undertaking that could avoid, mitigate, or minimize adverse effects on a National Register or eligible property. 36 C.F.R. § 800.4(d). The consulting parties must then execute a MOA either specifying how the adverse effects will be avoided or mitigated, or acknowledging that they cannot be avoided or mitigated and specifying any recording, salvage, or other measure to minimize the adverse effects that shall be taken before the undertaking proceeds. Id. Although other parties may be invited to sign the MOA as well, their participatory signature is not required under the applicable regulations. Id. at 800.6(c)(2). Once the MOA is "executed and implemented pursuant to [the ACHP regulations]" it evidences the agency official's compliance with § 106 of the NHPA. Colorado River Indian Tribes, 605 F. Supp. at 1436.

For the Snowbowl project, the agency ultimately made a "Finding of Adverse Effect." Accordingly, the record demonstrates that the agency then sought ways to avoid, minimize or otherwise mitigate the adverse effects that were associated with each of the three alternatives under consideration.[10] Furthermore, the record is replete with agency efforts to

---

[10]For example, the agency has guaranteed traditional cultural practitioners access within and outside the SUP as well as free use of the ski lifts in the summer. The agency has also committed to working to protect any plants of traditional importance that may be subsequently identified in the

involve the tribes in the resolution of those identified adverse effects.[11]  For example, three separate letters were sent out and three sets of phone calls were made specifically requesting tribal input on the resolution of the adverse effects.  These communications also included invitations for the tribes to meet and discuss the MOA.  The record also reveals that the Forest Service sent each tribe a draft MOA along with an invitation to participate as a consulting party in further developing the agreement.

Ultimately, the Forest Service's consultation efforts resulted in the execution of a MOA among the required parties.  Four Indian tribes, including two named Plaintiffs in this case, the Hualapai and the Yavapai-Apache Nation, also signed the MOA.  The MOA adequately describes the steps to mitigate the potential adverse effects of the proposed projects; therefore, it fully satisfied the Forest Service's obligations under the NHPA.[12]  The MOA includes steps that the Forest Service and ASR must take regardless of which alternative was ultimately chosen, including the obligation to continue to consult tribes to mitigate any adverse effects and to continue to guarantee access to the Peaks for traditional cultural activities.  Among other things, the MOA requires: (1) access before, during and after construction; (2) protection and regeneration of plants of traditional importance; (3) that the Forest Service must work to ensure that current ceremonial activities continue

project area.  Also, to the extent practicable, the Forest Service has indicated that the final location of new ski trails will use previously-disturbed areas.

[11] Throughout the tribal consultation process, the Forest Service made over 200 phone calls, held 41 meetings, and exchanged 245 letters with tribal representatives.  Although the consultation process did not end with a decision the tribal leaders supported, this does not mean that the Forest Service's consultation process was substantively and procedurally inadequate.

[12] The consultation process with the tribes did result in changes to the proposed action.  For example, the Snowbowl's request to have night lighting at the facility was not approved by the Forest Service, in part, due to Tribal comments and religious concerns that authorizing night lighting would not permit the Peaks to rest at night.  However, as the Plaintiffs point out, the removal of night lighting from the project proposal also addressed the fact that Flagstaff is a dark sky city.  Furthermore, the Forest Service found that night lighting did not meet the purposes and needs for the project.

uninterrupted; (4) that the Forest Service must protect shrines; (5) that tribes must be provided water-quality information; and (6) where practicable, projects must take advantage of previously-disturbed areas. Furthermore, the MOA also permits periodic inspections by tribal representatives, including prior to construction in order to minimize the impact of the pipeline route.

With respect to the Plaintiffs' argument regarding the timing of the completion of the MOA, the Court finds it unpersuasive. As the Defendants point out, NHPA encourages agencies to combine the consultation efforts with the NEPA process. 36 C.F.R. § 800.8. Nomination of a specific historic property to the National Register is a separate process that need not be complete in order for the agency to meet its consultation obligations under the NHPA.

The Court finds it important to note that consultation on the proposed Snowbowl improvements formally began in 2002 and spanned a two year period; however, the Forest Service has been consulting with approximately 13 tribes or chapters about the religious and cultural significance of the Peaks since at least 1970. The record indeed demonstrates that the Forest Service made extensive, good faith efforts to seek tribal input on the religious and cultural significance of the Peaks, and provided a reasonable opportunity for the tribes to participate in the resolution of the proposal's potential adverse effects.

C.   **National Forest Management Act**

The Plaintiffs claim that the Forest Service failed to ensure the viability of native species in the project area in violation of the National Forest Management Act, 16 U.S.C. §§ 1600-1687. Specifically, the Plaintiffs contend that the agency failed to adequately address potential impacts on certain management indicator species ("MIS"). For example, the Plaintiffs maintain that the Forest Service was required to collect population data from the project area for three MIS (Abert and red squirrels and the pygmy nuthatch). However, the Forest Service responds that the agency was not required to collect population data on these MIS in the Snowbowl area at all and satisfied NFMA by using the most up-to-date data

1  available to assess the potential impacts on forest-wide habitat and trends for the MIS.  The
2  Forest Service contends that it carefully evaluated the potential effects of the proposed
3  activities and determined that the project would not harm MIS or other wildlife.

4      The Court concludes that the Defendants satisfied NFMA's requirements by
5  complying with the Coconino Forest Service Plan direction related to MIS.  The currently
6  applicable Forest Service regulations specify that pending revision of Forest Plans, National
7  Forests have the option to utilize habitat data as to any obligation regarding MIS.  36 C.F.R.
8  § 219.14(f).  Furthermore, population monitoring is required only when the Forest Service
9  Plan so provides.  Id.  Accordingly, a review of the FEIS shows that the Forest Service
10  analyzed the effects of the Snowbowl alternatives on forest-wide habitat and trends for the
11  MIS.  The Forest Service concluded that, under the selected alternative, habitat modifying
12  activities within the SUP area "would not alter habitat for MIS outside the SUP area."  As
13  pointed out by the Forest Service, the Forest Service Plan does not require the Forest Service
14  to evaluate the impacts of the proposal on MIS because there are no MIS assigned to the
15  management area where the Snowbowl is located.  However, the Court finds that the Forest
16  Service did conduct a thorough assessment of the effects of the proposed reclaimed water
17  pipeline on MIS in MAs 3, 4, 5 and 9 as the pipeline will cross those management areas.

18      **E.    Grand Canyon Enlargement Act**

19      In their ninth claim for relief, the Havasupai Plaintiffs allege that the Forest Service
20  violated the GCEA "by permitting an activity that will detract from the existing scenic and
21  natural values of . . . lands [transferred to the Havasupai Tribe pursuant to the GCEA], [and]
22  failing to keep them 'forever wild.'"  Specifically, the Plaintiffs assert that the lands
23  transferred to the Havasupai Tribe will be "directly impacted by the spring melt from the
24  Snowbowl's snow made from reclaimed water."  However, because the Plaintiffs misconstrue
25  the GCEA, summary judgment on this claim is granted in favor of the Defendants.

26      As part of the GCEA, "Congress declared that an additional 185,000 acres were to be
27  held in trust enlarging the reservation of the Havasupai Tribe."  Havasupai Tribe v. United

28                                    - 20 -

States, 752 F. Supp. 1471, 1483 (D. Ariz. 1990) (citing 16 U.S.C. § 228i(a)).  However, the plain language of the GCEA and the legislative history described in the Havasupai Tribe opinion demonstrate that the GCEA does not impose any limitations on the government's uses of other lands and cannot be read to restrict activities on lands outside the Havasupai reservation.  752 F. Supp. at 1471.  As such, the Defendants are entitled to summary judgment on the Plaintiffs' GCEA claim.

### F.    Endangered Species Act

In its tenth claim for relief, the Hopi Plaintiffs allege that the Forest Service violated the ESA in its approval of the proposed project.  However, prior to asserting such a claim in the district court the Plaintiffs were required to have first provided written notice of the alleged violation to the Secretary of the Interior sixty days in advance of filing suit.  16 U.S.C. § 1540(g)(2)(A)(i).  Since the Hopi Plaintiffs did not provide such notice, this Court is without the jurisdiction to consider the claim.  See Southwest Center for Biological Diversity v. Bureau of Reclamation, 143 F.3d 515, 520-22 (9th Cir. 1998); Save the Yaak Comm. v. Block, 840 F.2d 714, 721 (9th Cir. 1988) (holding that 60-day notice requirement was not met and the ESA claim must be dismissed for lack of jurisdiction).  Accordingly, the Court grants summary judgment in the Defendants' favor on this particular claim.

### G.    Breach of Trust Claim

The Plaintiffs allege that the issuance of the Snowbowl SUP constitutes a violation of the government's trust responsibility to the tribes.  Although it is undisputed that the United States is indeed a trustee for the tribes, at issue in this case is whether that trust imposes any additional enforceable fiduciary duties upon Defendants with regard to the issuance of the SUP beyond compliance with generally applicable regulations and statutes.  Based on the governing law, the Court concludes that no such additional trust duties exist.  Although there may be a general fiduciary duty of the federal government owed to the tribes, "unless there is a specific duty that has been placed on the government with respect to Indians, this responsibility is discharged by the agency's compliance with general regulations

and statutes not specifically aimed at protecting Indians." Morongo Band of Mission Indians v. FAA, 161 F.3d 569, 574 (9th Cir. 1998).  Because this case does not involve tribal property, the Forest Service's duty to the tribes is to follow all applicable statutes.[13] Id. Since the Court has found that the agencies did not violate any statutes during the approval for the Snowbowl project, the agency satisfied its fiduciary duty to the local tribes.[14]

### D.   Religious Freedom Restoration Act

Pursuant to RFRA, the Plaintiffs seek declaratory and injunctive relief that would: (1) declare that the selected alternative, as approved, violated RFRA; and (2) stop the Forest Service and ASR from taking steps in furtherance of the selected alternative.  According to the Plaintiffs, the proposed upgrades to the Snowbowl, particularly the use of reclaimed water to make snow, will have negative, irreversible, and devastating effects to their religious, traditional and cultural practices.  However, the Defendants and ASR assert that since there is no evidence that the decision will exclude tribal practitioners from the Peaks, no evidence of any diminution of access, no inability to collect medicinal or ceremonial plants and other materials, and no prohibition on holding religious ceremonies anywhere on the Peaks, there is, consequently, no substantial burden on the exercise of the Plaintiffs' religion.

---

[13]The Havasupai Plaintiffs specifically argue that the Defendants breached their trust obligations by allegedly compromising the quality of the tribe's water, in violation of the GCEA. However, the Court previously concluded that the Plaintiffs have failed to state a violation of the GCEA and thus cannot use this statute to support its trust claim.

[14]The Navajo and Hualapai Plaintiffs both assert that the Forest Service has violated its trust responsibilities by failing to comply with certain Executive Orders; however, since these Executive Orders are not independently enforceable, such claims have no merit. The Executive Orders cited by the Plaintiffs expressly state that they "are intended only to improve the internal management of the executive branch" and do not create any trust responsibility or right to judicial review. See Exec. Order No. 12,898, 59 Fed. Reg. 7629, 7632-33 (Feb. 11, 1994) (provision 6-609; Exec. Order No. 13,007, 61 Fed. Reg. 26771, 26772 (May 24, 1996 (Sec. 4); Exec. Order No. 13,175, 65 Fed. Reg. 67429, 67252 (Nov. 6, 2000) (Sec. 10).  Furthermore, the FEIS documents that the Forest Service considered these Executive Orders.

1     Although the parties all moved for summary judgment on their RFRA claims, the

2   Court concluded that the claims were not suitable for disposition on summary judgment. Due

3   to the necessity for the Court to make various factual findings, a bench trial was held to

4   determine whether the proposed action placed a substantial burden on the Plaintiffs' exercise

5   of their religion.   Having reviewed the Administrative Record filed in this matter, the

6   pleadings. annexed declarations and exhibits on the cross-motions for summary judgment,

7   and having heard argument of counsel and testimony during an eleven-day bench trial, the

8   Court makes the following findings of fact and conclusions of law.[15]

9         **1.     Findings of Fact**

10              **a.     The Arizona Snowbowl and the San Francisco Peaks**

11   1.     The San Francisco Volcanic field covers approximately 1,800 square miles of

12         northern Arizona. The field lies along the southern perimeter of the Colorado Plateau,

13         defined by the Mogollon Rim to the south of Flagstaff.   The most prominent peak

14         within the field is Humphrey's Peak.  At 12,633 feet, Humphrey's Peak is the highest

15         point in Arizona.

16   2.     Collectively, Humphrey's Peak, Agassiz Peak (12,356 feet), Doyle Peak (11,460 feet),

17         and Fremont Peak (11,696 feet) are identified on the USGS maps as the San Francisco

18         Mountain.    However, the mountain is more commonly referred to as the San

19         Francisco Peaks and is identified as such herein.

20   3.     The Snowbowl ski area is located in the CNF in Northern Arizona which comprises

21         1.8 million acres of public land.  Specifically, the Snowbowl lies on the western flank

22         of the San Francisco Peaks ("Peaks").

23   4.     The Peaks cover approximately 74,000 acres of public land, and the ski area

24         constitutes about one percent (1%) of the mountain.

25

26        [15] The Court is aware that many of the findings made in the RFRA section of this opinion
     were previously mentioned within the Court's analysis regarding the counts subject to summary
27   judgment.  However, the Court chose to reiterate findings that were also pertinent to the RFRA
     claims despite the redundancy.

28                                  - 23 -

5.    The Peaks are extensively documented and widely recognized as a place of cultural importance to the Hopi, Navajo, and other tribes that are Plaintiffs in this case. For years, the Forest Service has recognized the cultural and religious significance of the Peaks to the tribes of the southwestern United States.

6.    The Forest Service has identified the Peaks as a Traditional Cultural Property ("TCP") as defined in the National Register Bulletin 38: Guidelines for Evaluating and Documenting Traditional Cultural Properties.[16] The Peaks have also been determined as eligible for inclusion on the National Register of Historic Places.

7.    The Snowbowl SUP area is surrounded on three sides by the Kachina Peaks Wilderness area, designated by Congress in 1984.

8.    Arizona Snowbowl Resort Limited Partnership ("ASR"), the Intervenor, is the current owner and operator of the facilities located within the Snowbowl SUP. The Snowbowl is operated under a 777-acre SUP which was issued to ASR by the Forest Service in 1992 pursuant to the National Forest Ski Area Permit Act of 1986, 16 U.S.C. § 497b.

9.    The Forest Service has designated the Snowbowl as a public recreation facility under the Coconino Forest Service Plan. In doing so, the Forest Service found that the Snowbowl represented an opportunity for the general public to access and enjoy public lands in a manner that the Forest Service could not otherwise offer in the form of a major facility anywhere in Arizona.

---

[16]A TCP is a place that is associated with the cultural practices or beliefs of a living community. Those practices or beliefs must be rooted in the history of the community and be important in maintaining the continuing cultural identity of the community. While not all TCPs are eligible for the National Register, a TCP is eligible if the property plays a role in a community's historically rooted beliefs, customs and practices and meets one of four National Register Criteria for significance: (A) is associated with significant events; (B) is associated with a significant person; (C) is an outstanding example of a type; or (D) is associated with information contained in an archaeological site.

10.   The Snowbowl is the only area dedicated as a downhill ski resort within the CNF. Furthermore, the Coconino Forest Service Plan was approved in 1987 after a separate Environmental Impact Statement process that included public involvement and comment.

11.   In addition to downhill skiing, numerous activities are conducted on the Peaks, consistent with the Coconino Forest Service Plan and multiple-use requirements, including sheep and cattle grazing, timber harvesting, road building, mining (including cinder pit mining), gas and electric transmission lines, water pipelines, cellular towers, motorcross, mountain biking, horseback riding, hiking and camping.

12.   The Snowbowl serves a growing population in Arizona based primarily in the Phoenix metropolitan and northern Arizona areas. The Snowbowl is an important public recreational resource of the CNF.

13.   Skiing has occurred in the Snowbowl area since the 1930s.

14.   In 1979, the Forest Service conducted an extensive process pursuant to the EPA to evaluate proposed upgrades to the Snowbowl, which included the installation of new lifts, trails and facilities. The 1979 Forest Service decision approved 206 acres of skiable terrain and facilities to support a comfortable carrying capacity of 2,825 skiers.

15.   The Forest Service's 1979 decision to approve the Snowbowl upgrades was challenged in the courts by several Indian tribes.

16.   In Wilson v. Block, 708 F.2d 735 (D.C. Cir. 1983), cert. denied, 464 U.S. 956 (1983), the Court upheld the Forest Service's decision and found that the project did not substantially burden the tribes' exercise of religion. In addition, the Court upheld the more general question of whether to permit skiing in the area. Since the Wilson decision, the tribes have continued to use the Peaks for religious purposes.

- 25 -

17.   Over the last several years, the Snowbowl has experienced highly variable snowfall and associated extreme variability in skier visits, resulting in financial deficits over many years and daunting operational issues.

18.   Due to its age, many of the existing ski runs at the Snowbowl area are old, steep and narrow which raise ample safety concerns.  Likewise, other Snowbowl upgrades are needed to increase the amount of intermediate terrain to spread skiers out and eliminate congestion.

### b.   The Forest Service Decision and the Snowbowl Upgrades

19.   In 2002, ASR initiated the process of having the Forest Service approve upgrades to the existing ski area, which included a proposal for snowmaking.  Shortly thereafter, in June of 2002, the Forest Service began its screening process to develop a Proposed Action.

20.   Prior to notifying the general public about the proposed upgrades at the Snowbowl in September of 2002, the Forest Service sought input from the tribes.

21.   After the proposed action was released to the general public, the Forest Service continued to consult with the tribes, in order to determine the potential or perceived impacts of the proposed facilities improvements to the Snowbowl.  The Forest Service made more than 500 contacts with tribal members as part of the Snowbowl consultation process, including between 40 and 50 meetings.

22.   After the Forest Service formally accepted the ASR proposal in September of 2002, the agency initiated the National Environmental Policy Act ("NEPA") scoping process by releasing the proposed action to the general public on September 23, 2002. The Forest Service mailed the NEPA scoping notice to hundreds of community residents, interested individuals, Indian tribes, public agencies, and other organizations.

23.   As a result of the NEPA scoping notice, approximately 1,200 comment letters were received and evaluated by the Forest Service.

24. The Forest Service released the Draft Environmental Impact Statement ("DEIS") to the public, including the Plaintiff tribes, on February 2, 2004, and announced that the preferred alternative included snowmaking with Class A+ reclaimed water from the City of Flagstaff's Rio de Flag Water Reclamation Plant.

25. As a result of the DEIS, the Forest Service received and evaluated close to 9,900 comments.

26. As part of its environmental analysis, the Forest Service gave detailed consideration to three alternatives: the No Action Alternative (Alternative One); the Preferred Alternative (Alternative Two): and a no snowmaking alternative (Alternative Three).

27. The Forest Service found that Alternative Two best met the purposes and needs of the proposed action.

28. The Forest Service considered at least nine additional alternatives, including: reducing the level of snowmaking, fewer upgrades, closing the Snowbowl altogether, and using potable water rather than reclaimed water for snowmaking. The Forest Service determined that these alternatives did not warrant detailed evaluation, or were not feasible.

29. In February of 2005, the Forest Service issued the Final Environmental Impact Statement ("FEIS") and the Coconino National Forest Supervisor signed the Record of Decision ("ROD") approving Alternative Two.

30. The Plaintiffs appealed the Forest Supervisor's decision on April 25, 2005. Accordingly, the Forest Service's Southwestern Regional Office arranged a technical review team to evaluate the administrative appeals.

31. On June 8, 2005, the Forest Service responded to and denied these appeals. In pertinent part, the Forest Service denied Plaintiffs' claims that the project would have a substantial burden on their ability to practice their religion.

32. Under the ROD, the Snowbowl facilities improvements include realignment and/or lengthening of three existing chair lifts; installation of one new chair lift and four

surface lifts; development of new ski terrain, increasing the ski acreage within the SUP area from approximately 138 acres to approximately 204 acres; development of a new snowplay/tubing area, with associated improvements to parking and guest service facilities; installation of snowmaking infrastructure to cover approximately 204 acres of the SUP; and improvements to other service facilities and ski area infrastructure, such as lodges.

33. With the exception of the snowplay facility and the snowmaking, the infrastructure improvements authorized by the Forest Service are comparable to those first authorized by the Forest Service in 1979 and upheld in <u>Wilson</u>. For example, the 2005 Snowbowl decision and the 1979 decision both approved about 205 acres of skiable terrain and facilities to comfortably support 2,825 skiers at one time.

34. The authorized skiable terrain remains at just over 200 acres and the Snowbowl's comfortable carrying capacity ("CCC") remains unchanged at 2,825 skiers at one time, as previously approved by the Forest Service in 1979.

35. The area proposed for snowmaking is approximately one quarter of one percent (1%) of the Peaks.

36. All authorized improvements will occur within the existing 777-acre SUP area, with the exception of a 14.8 mile buried reclaimed water pipeline that will be constructed within existing road or utility right-of-ways.

37. The pipeline will also be equipped with fire hydrants to provide a water source for fire suppression needs within the rural residential areas between Flagstaff and the ski area as well as to fight forest fires. Likewise, a reservoir of water will be maintained at the ski area and will be available for forest fire suppression.

38. The snowplay facility will address safety issues associated with snowplay on the trails within the SUP that conflicts with downhill skiers, as well as unmanaged snowplay and unauthorized parking along Snowbowl Road that the Forest Service has had a long time interest in addressing.

39.   The upgrades to existing trails and other features, including snowmaking, will improve safety conditions and minimize the potential for accidents at the Snowbowl.

40.   The snowmaking component of the Snowbowl upgrades includes the use of reclaimed water from the Rio de Flag WRF. The WRF is a tertiary water reclamation facility, also known as an advanced treatment facility.

41.   To ensure that reclaimed water is used safely without adversely affecting public health or environment, the Arizona Department of Environmental Quality ("ADEQ") has established five water categories (A+, A, B+, B, C) specifying the minimum levels of treatment and water quality criteria.

42.   Reclaimed water that has been treated at the WRF is categorized as Class A+ water, which is the highest quality of reclaimed water classified by the ADEQ.

43.   The Class A+ water proposed to be used in the snowmaking by the Snowbowl is therefore the highest grade of reclaimed water recognized under Arizona statutes and regulations. Class A+ reclaimed water has been approved for use in snowmaking by the ADEQ.

44.   The level of treatment and the water quality criteria required for use of reclaimed water depends upon the expected degree of human, animal, and plant contact. Pursuant to the ADEQ's regulations, the reclaimed water to be used at the Snowbowl will undergo specific advanced treatment requirements, including tertiary treatment with disinfection.   In addition, the reclaimed water will comply with specific monitoring requirements, including frequent microbiological testing to assure pathogens are removed, and reporting requirements.

45.   Reclaimed water from the WRF is subject to a variety of tests to ensure that the water is adequately treated to remove bodily fluids, such as blood.

46.   Reclaimed water from the WRF must comply with extensive treatment and monitoring requirements under three separate permit programs: the Arizona Pollutant Discharge Elimination System ("AZPDES") Permit, the Arizona Aquifer Protection

Permit Program, and the Water Reuse Program. Additionally, industrial facilities in the City of Flagstaff are required to comply with the city's Industrial Pre-Treatment requirements.

    **c.  Plaintiffs' Religious Beliefs and Practices on the Peaks**

47. Certain Indian religious ceremonies are conducted on the Peaks, such as the Navajo Blessingway Ceremony, and certain plants, water and other materials are collected from the Peaks for Navajo medicine bundles and other tribal healing ceremonies.

48. The Plaintiff tribes believe that the Peaks is a living entity and that the presence of the Snowbowl desecrates the mountain.

49. Certain practitioners believe that the alleged desecration of the Peaks has caused many ills to mankind, including attacks on 9/11/01, the Columbia Shuttle crash, and the increase in natural disasters, such as recent hurricanes, tornados, and the tsunami.

50. Certain practitioners believe that upgrades to the Snowbowl will result in further ills and will harm their beliefs.

51. Certain practitioners believe that upgrades to the Snowbowl will jeopardize the continuation of their religion.

52. Native practitioners also believe that certain deities, such as Kachina or Ga'an, dwell on the Peaks, and that snowmaking (irrespective of the source of water) will negatively impact the deities, potentially causing drought or other suffering.

53. Certain practitioners also believe that the Class A+ reclaimed water from the City of Flagstaff to be used for snowmaking contains the souls of the dead because the city hospital, morgue and mortuary contribute minor amounts to the discharge from the Rio de Flag WRF and that the use of the reclaimed water will affect the purity of the Peaks.

54. Although the Indian tribes and their members differ in their use of the Peaks for religious purposes and have different views on how to best manage the area, the Plaintiff tribes and their members do hold the uniform beliefs that the Peaks are sacred,